# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JENNIFER L. BRINKLEY**, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | 2:11cv1557 |
| **GARDEN RIDGE MANAGEMENT, LLP.**, | ) ) ) ) | **Electronic Filing** |
| Defendant. | ) | |

## MEMORANDUM OPINION

August 16, 2013

**I. INTRODUCTION**

Plaintiff, Jennifer L. Brinkley ("Brinkley" or "Plaintiff") filed a three (3) count Complaint alleging: (1) age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (the "ADEA"); (2) gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); and (3) violations of the Pennsylvania Human Rights Act, 43 Pa. Cons. Stat. Ann. § 925 *et seq.* (the "PHRA"), against Defendant Garden Ridge Management, LLP ("Garden Ridge"). Garden Ridge has filed a motion for summary judgment, Brinkley has responded and the motion is now before the Court.

**II. STATEMENT OF THE CASE**

Brinkley, an adult female over the age of forty (40), was employed by Garden Ridge as an Assistant Manager/Co-Manager[1] of Garden Ridge Store 57 from August 18, 2008, until her termination on April 26, 2010. Garden Ridge Concise Statement of Material Facts (hereinafter

---

[1] In February of 2009, Brinkley's title was changed to "Co-Manager" as a result of corporate restructuring. The job requirements for Assistant Manager and Co-Manager were substantially similar. G-R CSMF ¶ 5.

"G-R CSMF") ¶¶ 1, 3, 4 & 5. Two other Co-Managers worked with Brinkley at Store 57 in 2010, Cary McShane and Gino Paoletti. G-R CSMF ¶ 7. As Co-Manager, Brinkley reported to Store 57's General Manager, Jill C. Woods ("Woods"). G-R CSMF ¶ 8. Woods reported to District Manager, Howard Basinger ("Basinger"). G-R CSMF ¶ 9.

Brinkley's responsibilities as Co-Manager were: (1) supervision of store employees, such as merchandise managers and store associates; (2) unloading and shelving merchandise; (3) customer service; (4) store cleanliness; and (5) managerial duties including completing new hire paperwork, verifying till totals, preparing deposits, and adjusting the store schedule.. G-R CSMF ¶¶ 12, 13 & 14. All management level employees are responsible for following the policies and directives from Garden Ridge's corporate office. G-R CSMF ¶ 17. The highest ranking employee in the store at any given time, the manager on duty, is responsible for ensuring that Garden Ridge's policies and procedures are followed within the store. *Id.*; Laube Declaration ¶ 12.

On February 12, 2010, Tina Laube, Vice President of Operations for Garden Ridge, sent an e-mail to all stores and district managers regarding new store staffing policies. G-R CSMF ¶ 18. The "Subject" of the e-mail was "nights - please print, read, implement tonight, and let me know if you have any other suggestions" and in relevant part stated as follows:

> As you are all aware, we close <u>all stores</u> with a staff of 4 people from Tier 1 to Tier 8. The purpose of this type of schedule is to drive more work/productivity to the mornings/afternoons. Then leave evenings largely to checking out customers, carry outs, and minimal other duties. . .
>
> With our labor models the way they are it is critical to always get as much productivity out of every minute possible, but I want you to review what is occurring in your building and make immediate changes to ensure we are creating a safer work environment, while reducing shrink, without putting too much pressure on your night crews.

> Here is what I suggest you implement immediately:
>
> . . . you can let your team of two work on the front end, while
> other team of 2 work [put aways]. . . .
> Get with your teams and set expectations that during any time in
> the evening that **at least two people** (FEM and someone else) have
> their eyes on the front door.
>
> Please make immediate change tonight!!

*See* Garden Ridge Appendix Exhibit B[2]. Laube contends that the instruction to have two (2) employees at the front end of every store was reiterated to all stores on multiple occasions. Laube Declaration ¶ 9. Laube also instructed all stores that during evening hours, all employees not assigned to the front of the store, must work in teams. *Id.* Similarly, Garden Ridge requires two (2) employees to be present when a store is opened for the day. G-R CSMF ¶ 22. The General Manager or Co-Manager is not permitted to open the store and enter alone unless specifically approved by the District Manager. Laube Declaration ¶ 10.

Garden Ridge also maintains policies regarding the conduct and appearance of its employees on the sales floor, including: (1) sales associates are not permitted to use cell phones on the sales floor; (2) sales associates are required to wear an approved uniform; and (3) "hoodie" jackets and "hoodie" style clothing are not permitted. G-R CSMF ¶¶ 24 & 25; Laube Declaration ¶ 11.

On March 10, 2010, Allan Bauwin, Director of Stores and Basinger's immediate supervisor, made an unannounced visit to Store 57. G-R CSMF ¶¶ 10 & 26. Bauwin praised the store's physical appearance, but noted critical policy violations. G-R CSMF ¶ 26. During his visit, Bauwin found that there were not two employees at the front end of the store, and the

---

[2] Exhibit B of the Appendix consists of Laube's declaration and three (3) exhibits to her declaration.

remaining employees were not working in teams. G-R CSMF ¶ 29. Brinkley testified that Bauwin walked the store with her and Woods, the General Manager, and told them that "he was so happy with how the store looked that he could give us both a hug." Brinkley Depo. p. 41. Brinkley found the comment to be "discriminating (sic) and off-color," but did not contact either Laube or human resources with regard to the remark. Brinkley Depo. p. 42.

Bauwin contacted Basinger and informed him that despite recent reminders, Brinkley, who was the manager on duty on the day of the visit, was not following the "team" directive. G-R CSMF ¶ 29. Basinger and Bauwin determined that Brinkley should receive a warning. G-R CSMF ¶ 30. A "Performance Discussion Record" dated March 19, 2010, indicates that Basinger gave Brinkley a verbal warning for "[f]ailure to follow company directive relating to new workload/ evening front end coverage (2 people on the front end, team of 2 on floor in evening). This program had been communicated multiple times to the entire company including two emails from Tina to all store management on 3/2 and 3/9." Brinkley Appendix Ex. G.

In addition to the monthly audits conducted by district managers, Garden Ridge also conducts more in-depth unannounced audits of all its stores. Laube Declaration ¶ 13; G-R CSMF ¶ 35. The audit consists of a "secret shopper" during which a Garden Ridge representative examines the store from a shopper's perspective, without revealing his or her identity, and after the representative identifies himself or herself, the representative conducts a formal audit. Laube Declaration ¶ 13; G-R CSMF ¶ 36. The formal audit examines the stores' compliance with corporate policies and directives. *Id.*

On April 20 and April 21, 2010, Operations Specialist Susan Summers ("Summers") conducted an unannounced audit of Store 57. G-R CSMF ¶ 37. During the "secret shopper" portion of the audit on the evening of April 20, Summers found that Store 57 was not following Garden Ridge's team directive as the store did not have two (2) employees at the front of the

store, and the remaining employees were not working in teams. G-R CSMF ¶¶ 38 & 39. Brinkley was the manager on duty at the time. G-R CSMF ¶ 38. Brinkley also noted that one employee was talking on his cell phone, and another employee was wearing a "hoodie" jacket. G-R CSMF ¶ 40. On the morning of April 21st, Summers returned to Store 57 to conduct the formal audit. G-R CSMF ¶ 41. From her vehicle, Summers observed Brinkley, the manager on duty that morning, open the store and enter by herself. *Id.*

Summers reported the violations to Laube. Laube Declaration ¶ 16 & Exhibit 2. Laube then e-mailed Basinger and Bauwin noting the many policy violations and indicating her disgust "with the **continued** renegade behavior." Laube Declaration ¶ 16 & Exhibit 3 (emphasis in original). Laube told Basinger and Bauwin "to review and discuss" and to send Laube their "list of proposed actions and timelines immediately." Laube Declaration Exhibit 3. Bauwin confirmed to Laube that he had previously addressed the teamwork and scheduling issues with Brinkley. Laube Declaration ¶ 17. Because Basinger had previously issued Brinkley a warning for the same conduct, and because of the numerous policy violations, Laube decided to terminate Brinkley immediately. Laube Declaration ¶ 18. Basinger informed Brinkley of her termination on April 26, 2010. G-R CSMF ¶ 49.

### III. LEGAL STANDARD FOR SUMMARY JUDGMENT

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment shall be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. To support denial of summary judgment, an issue of fact in dispute must be both genuine and material, *i.e.*, one upon which a reasonable fact finder could base a verdict for the non-moving party and one which is essential to establishing the claim. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). When considering a motion for summary

judgment, the court is not permitted to weigh the evidence or to make credibility determinations, but is limited to deciding whether there are any disputed issues and, if there are, whether they are both genuine and material. *Id*. The court's consideration of the facts must be in the light most favorable to the party opposing summary judgment and all reasonable inferences from the facts must be drawn in favor of that party as well. *Whiteland Woods, L.P. v. Township of West Whiteland,* 193 F.3d 177, 180 (3d Cir. 1999), *Tigg Corp. v. Dow Corning Corp.*, 822 F.2d 358, 361 (3d Cir. 1987).

When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In the language of the Rule, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P 56(e). Further, the nonmoving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion. *Williams v. Borough of W. Chester*, 891 F.2d 458, 460 (3d Cir.1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The non-moving party must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the non-moving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. Of Sterling, Inc.*, 142 F. 3d 639, 643 n. 3 (3d Cir. 1998), *quoting Fuentes v. Perskie*, 32 F.3d 759, 762 n.1 (3d Cir. 1994). ).

**IV.    DISCUSSION**

    A.    <u>Age Discrimination Under the ADEA and the PHRA</u>

Brinkley contends that her employment with Garden Ridge was wrongfully terminated based upon her gender and her age[3]. Under the ADEA, an employer is prohibited from discharging any individual or otherwise discriminating against an individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's age. 29 U.S.C. § 623(a)(1). A plaintiff can sustain a claim of discrimination under the ADEA by presenting either direct or circumstantial evidence of discrimination. *See Duffy v. Magic Paper Group, Inc.*, 265 F.3d 163, 167 (3d Cir. 2001). Because Brinkley has not provided direct evidence of discrimination, our inquiry is governed by the three-part framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-803, (1973) (the "McDonnell Douglas analysis"). *See Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) (reaffirming the use of the McDonnell Douglas analysis in ADEA cases involving indirect evidence).

Under the McDonnell Douglas analysis, once the employee establishes a *prima facie* case of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's adverse employment decision. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802. If the employer makes that showing, the burden of production shifts once again to the employee to establish that the employer's proffered justification for the adverse action is pretextual. *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 254-255 (1981). Throughout this burden-shifting exercise, the burden of persuasion remains on the employee. *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1095 n.4 (3d Cir. 1995) (citing *Tex. Dep't of Comm. Affairs v. Burdine*, 450 U.S. at 253).

---

[3] There is no need to differentiate between Brinkley's Federal discrimination claims and PHRA claims because, for our purposes, the same analysis is used for each. *See, e.g., Simpson v. Kay Jewelers*, 142 F.3d 639, 643-44 & n.4 (3d Cir. 1998); *Jones v. School District of Philadelphia*, 198 F.3d 303, 410-411 (3d Cir. 1999); *Fairfield Township Volunteer Fire Co. No. 1 v. Commonwealth*, 609 A.2d 804, 805 (Pa. 1992).

Brinkley, therefore, bears the initial burden of establishing a *prima facie* case of discrimination. *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 539 (3d Cir. 2006); *Atkinson v. LaFayette College*, 460 F.3d 447, 454 (3d Cir. 2006). To establish a *prima facie* case, Brinkley must demonstrate that: (1) she is a member of the protected class, *i.e.* at least 40 years of age; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) that she was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus. *Smith v. City of Allentown*, 589 F.3d at 689 (citing *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004). To establish a *prima facie* case at summary judgment, "the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] *prima facie* case." *Duffy v. Paper Magic Grp.*, 265 F.3d 163, 167 (3d Cir. 2001). Garden Ridge concedes for the purpose of this motion only that Brinkley can show a *prima facie* case of age discrimination.

The burden now shifts to Garden Ridge to offer a legitimate non-discriminatory reason for terminating Brinkley. *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997); *Simpson v. Kay Jewelers*, 142 F.3d at 644 n.5. This burden is "relatively light" and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason. *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994)); *see also Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012) (describing this step as a "minimal burden").

The Court finds that Garden Ridge has met its burden. Garden Ridge has produced evidence that Brinkley was terminated for repeated violations of the company's policies. On March 19, 2010, Basinger gave Brinkley a verbal warning for failing to follow company the directive relating to having two people at the front of the store and the remaining employees

8

working in teams. G-R CSMF ¶¶ 38 & 39. Notwithstanding, Basinger's discussion regarding the violations of Garden Ridge policies, an unannounced audit on April 20 and April 21, 2010, revealed that the following policy violations while Brinkley was manager on duty: (1) failure to have two (2) employees at the front of the store, and the remaining employees working in teams; (2) an employee was observed talking on his cell phone; (3) an employee was wearing a "hoodie" jacket; and (4) on the morning of April 21st, Brinkley opened the store and entered by herself without seeking prior approval by the District Manager. Because Basinger had previously issued Brinkley a warning for the same conduct, the decision was made to terminate Brinkley for violating Garden Ridge policies and directives.

Brinkley must show that Garden Ridge's articulated reason for her termination is merely a pretext for age discrimination. An employee may demonstrate that her employer's legitimate nondiscriminatory reason is pretextual by submitting evidence that allows a factfinder to either 1) disbelieve or discredit the employer's justification; or 2) believe discrimination was more likely than not a "but for" cause of the adverse employment action. *Abels v. Dish Network Serv., LLC*, 2012 U.S. App. LEXIS 25384, 9-10 (3d Cir. Pa. Dec. 12, 2012)(citing *Fuentes v. Perskie*, 32 F.3d at 764). *See also Gross v. FBL Fin. Servs.*, 557 U.S. 167, 177-178 (2009). Evidence undermining an employer's proffered legitimate reasons must be sufficient to "support an inference that the employer did not act for its stated reasons." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 731 (3d Cir. 1995).

In order to discredit Garden Ridge's proffered justification under the first prong of *Fuentes*, Brinkley must present evidence demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies (sic), or contradictions" in the proffered reasons "that a reasonable factfinder could rationally find them unworthy of credence," and ultimately infer that Garden Ridge did not act for the asserted nondiscriminatory reasons. *Fuentes v. Perskie*, 32 F.3d at 765.

9

If Brinkley's evidence rebutting Garden Ridge's proffered reason permits a factfinder to conclude that such reason (or reasons) was either a "post hoc fabrication" or otherwise did not actually prompt the employment action, then summary judgment is inappropriate. *Fuentes v. Perskie*, 32 F.3d at 764.

Alternatively, Brinkley must show that age-based discrimination was a "but-for" cause of Garden Ridge's decision to terminate her. To meet this burden, Brinkley "cannot simply show that [Garden Ridge's] decision was wrong or mistaken." *Fuentes v. Perskie*, 32 F.3d at 765. The question is whether Garden Ridge was motivated by a discriminatory animus, not whether Garden Ridge was wise, shrewd, prudent, or competent. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 531, 533 (3d Cir. 1992); *Villanueva v. Wellesley College*, 930 F.2d 124, 131 (1st Cir.), *cert. denied*, 502 U.S. 861 (1991). *See also Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995) ("[A]n employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason.").

Brinkley contends that Garden Ridge's reasons for terminating her were pretextual because: (1) she had no disciplinary record for the first two years of her employment; (2) prior to Brinkley's violation of store policies, her supervisor indicated that Store 57 maintained high standards; and (3) the policy regarding store staffing was impossible to follow.

Brinkley's contention that she had no disciplinary record during her first two years of employment is not only insufficient to prove that Garden Ridge's real reasons for terminating her employment were discriminatory, but it is also inaccurate. On February 19, 2010, Brinkley was given a warning, and an Attendance Discussion Record was created, for tardiness. Brinkley Appendix, Ex. G. On March 10, 2010, Bauwin found that Store 57 failed to have two employees at the front of the store, failed to work in teams. As a result, Basinger issued Brinkley a verbal warning, and created a Performance Discussion Record, on March 19, 2010. Further, Brinkley's

noted failures on April 20 and April 21, 2010, which led to her termination, also occurred within two (2) years of the commencement of her employment on August 18, 2008.

The final two reasons asserted by Brinkley also fail to establish that the Garden Ridge's proffered justification for her termination was pretextual. Whether the store was maintained at a high level is irrelevant to a discussion regarding policy violations and discrimination. Moreover, there was no discriminatory animus associated with Basinger's statement regarding the store maintenance. Whether Brinkley believes a policy is impossible to follow is also irrelevant. It is not for the Court to determine whether Garden Ridge's policies were wise or good business practice. The issue is whether Garden Ridge was motivated by a discriminatory animus, and Garden Ridge's business policies are not evidence of discrimination. Brinkley, therefore, failed to show that any of these incidents are evidence of pretext. *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d at 540; *Simpson v. Kay Jewelers*, 142 F.3d at 648.

Finally, Brinkley argues that she was treated less favorably than similarly situated younger male employees, Gino Paoletti and Allan Myers. The Third Circuit has instructed that under the McDonnell Douglas analysis, a plaintiff is not permitted to simply selectively choose a comparator in order to show differing treatment among protected and non-protected group members[4]. *See Simpson v. Kay Jewelers*, 142 F.3d at 645. *See also Donlin v. Philips Lighting N. Am. Corp.,* 581 F.3d 73, 90 (3d Cir. 2009) (plaintiff could not selectively "pick and choose" a

---

[4] In *Kay Jewelers*, the Third Circuit found that allegations concerning the treatment of one younger employee were insufficient as a matter of law to infer age discrimination. *Id.* at 645. The determination of whether an employer's actions support an inference of discrimination is to be made based on the treatment of the allegedly more favored group as a whole, such that a showing of preferential treatment to one member of the non-protected class, standing alone, is generally not sufficient to create an inference of discrimination. *See id.* at 645-46; *see also McDonnell Douglas*, 411 U.S. at 804 (employer's actions are prohibited only if based on criteria applied to members of all races). If the use of a single comparator is insufficient to raise an inference of age discrimination, it is also inadequate to establish pretext.

comparator for purposes of computing damages under Title VII, rather plaintiff must choose similar employees against whom to compare herself). To be deemed similarly situated, the comparator must be roughly equivalent to the person in question. *Gazarov v. Diocese of Erie*, 80 Fed. App'x. 202, 205 (3d Cir. Pa. 2003) (citation omitted).

Clearly, "similarly situated" employees need not be "identically situated" in order to be valid comparators. *See Bennun v. Rutgers State Univ.*, 941 F.2d 154, 178 (3d Cir. 1991). Courts have recognized, however, that in order for an co-employee to be an appropriate comparator, he or she should hold a similar position, report to the same supervisor, possess a similar disciplinary record, and engage in the same type of misconduct as the plaintiff. *Hodczak v. Latrobe Specialty Steel Co.*, 761 F. Supp. 2d 261, 269 (W.D. Pa. 2010); *See also, e.g., Opsatnik v. Norfolk Southern Corp.*, 335 F. App'x. 220, 223 (3d Cir. 2009) (non-precedential opinion) ("Which factors are relevant [in discerning whether an individual is similarly situated] is determined by the context of each case, but often includes a 'showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'"(internal citations omitted)); *Martin v. Pachulski, Stang, Ziehl, Young & Jones, P.C.*, 551 F. Supp. 2d 322, 329 n.2 (D. Del. 2008) (employees who did not hold the same positions were not comparably situated); *Robinson v. PFPC, Inc.*, 2010 U.S. Dist. LEXIS 19303, 2010 WL 744191, at *5 (E.D. Pa. Mar. 4, 2010); *Dawson v. Harran*, No. 08-7, 2009 U.S. Dist. LEXIS 69428, 2009 WL 2431343, at *6 (E.D. Pa. Aug. 6, 2009) (co-workers who did not share the same supervisor, were employed for a longer period of time, and did not hold equivalent title could not be used as comparators.)

Though Paoletti held a similar position at Garden Ridge, Co-Manager, the record does not support Brinkley's contentions regarding his disciplinary history. Brinkley contends that

Paoletti had four (4) policy violations, two of which were in a two week period, yet he was not terminated. The record before the Court shows that Paoletti had three (3) Employee Violation Notifications: (1) on December 21, 2010, he opened the store late; (2) on January 13, 2011, he failed to report a cash shortage of $20.19 on a register, when any shortage over $20.00 must be reported; and (3) on August 12, 2011, Paoletti failed to complete a mid-day walk through the store and the conditions of the store were below standard. *See* Brinkley Appendix, Ex. C. None of the violations set forth above occurred within a two week period as alleged, and the violations do not reflect violations of the same policy. Consequently, Paoletti and Brinkley did not have similar disciplinary records.

Moreover, these violations occurred subsequent to the terminations of both Brinkley and her supervisor, Jill Woods. Paoletti, therefore, did not have the same supervisor as Brinkley at the time of his violations. Further, Brinkley's contention that Paoletti was paid more than her though she was "eminently more qualified," has no support in the record. Brinkley has failed to show that Paoletti was "similarly situated" for purposes of establishing a pretext for either age or gender discrimination.

Brinkley also asserts that Allan Myers, a younger male who was her replacement, was late for work on November 30, 2010, and he received a warning for the infraction. Brinkley argues that he was treated "more favorably for the same infraction for which [she] was allegedly terminated." Again, there is no support in the record for such contention, as Brinkley was not terminated for her tardiness. She received a warning, just as Meyers did. *See* Brinkley Appendix, Ex. G. Brinkley, therefore, fails to show that Meyers was "similarly situated" for purposes of establishing a pretext for either age or gender discrimination.

This Court is unable to find any evidence in the record that would either cast doubt on the veracity of Garden Ridge's proffered reason or suggest that the proffered reason

13

was merely a pretext for discrimination. Accordingly, Brinkley's age discrimination claim fails as a matter of law.

### B. Gender Discrimination Under Title VII and the PHRA

The burden shifting analysis of *McDonnell Douglas* is also used to analyze Brinkley's claims under Title VII. *See Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318 (3d Cir. 2000). Garden Ridge concedes for the purpose of this motion only that Brinkley can show a *prima facie* case of gender discrimination, therefore, the burden shifts to Garden Ridge to offer a legitimate non-discriminatory reason for Brinkley's termination. As set forth above, the Court finds that Garden Ridge met its burden by producing evidence that Brinkley was terminated for repeated violations of the company's policies. Brinkley, therefore, must show that Garden Ridge's articulated reasons for her termination were merely a pretext for gender discrimination.

Aside from the above listed reasons that this Court previously determined did not establish a discriminatory animus, Brinkley directs the Court to certain statements made by Laube and Bauwin that she contends would allow a factfinder to determine that Garden Ridge's articulated reasons for her termination were merely a pretext for gender discrimination. Woods contends that the following two (2) statements made by Laube are evidence of discrimination: (1) an e-mail dated February 26, 2010, that instructed managers to "get the emotion out and get rid of the bottom performers"; and (2) a statement in the April 21st e-mail to Basinger in which she indicated her disgust with the "**continued** renegade behavior." Laube Declaration ¶ 16 & Exhibit 3 (emphasis in original). The Court finds both statements to be innocuous, made in a nondiscriminatory context, and insufficient to prove either pretext or that gender was more likely than not a "but for" cause of Brinkley's termination.

Finally, Brinkley contends that Bauwin's remark during his visit to Store 57 that he was so happy with how the store looked that he could give both Brinkley and Woods "a hug" was

evidence of discrimination.  In considering whether stray remarks, such as the comment made by Bauwin, are probative of discrimination, the Court of Appeals for the Third Circuit has considered the following factors: "(1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement." *Parker v. Verizon Pa., Inc.*, 309 Fed. Appx. 551, 558-559 (3d Cir. Pa. 2009)(quoting *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 133 (3d Cir. 1997)); *see also Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1112 (3d Cir. 1997). "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Fuentes v. Perskie*, 32 F.3d at 767 (quoting *Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d at 545).

Though not temporally remote, the alleged remark made by Bauwin was not made in the context of an employment or personnel decision. Moreover, the decision to terminate Brinkley was made by Laube based upon an audit performed by Operations Specialist Susan Summers, and there is no evidence that either Laube or Summers demonstrated a discriminatory animus.

Such evidence, therefore, fails to convince the Court that a factfinder could reasonably believe Garden Ridge's articulated reasons for the termination were false.  Nor is there any evidence that Garden Ridge was systematically ridding itself of "older" or "female" managers. Based upon the foregoing, Brinkley fails to show that her termination was pretextual.  Summary judgment on Title VII and PHRA claims shall be granted.

### V. CONCLUSION

The Court finds that there are no material facts in dispute, Brinkley is unable to show that that Garden Ridge violated her rights under the ADEA, Title VII or the PHRA.  Accordingly,

Garden Ridge's motion for summary judgment shall be granted. An appropriate order will follow.

s/ David Stewart Cercone  
David Stewart Cercone  
United States District Judge

cc: Jeffrey P. Myers, Esquire
    Cory E. Ridenour, Esquire
    Paul E. Hash, Esquire

   (*Via CM/ECF Electronic Mail*)